UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                  )
                                  )
UNITES STATES OF AMERICA,         )
                                  )   Crim. No. 1:14-10088-PBS
                                  )
         v.                       )
                                  )
HAROLD BATES,                     )
                                  )
         Defendant.               )
                                  )
_____ )
```

**MEMORANDUM AND ORDER**

April 24, 2015

Saris, U.S.D.J.


    Defendant, Harold Bates, charged with trafficking in methylone,[1] moves to suppress the contents of four postal parcels, statements made regarding those parcels, and items found at his residence on December 7, 2013. The Court held evidentiary hearings on February 12, 2015 and March 25, 2015. Officer Richard Seibert, a narcotics canine-handler with the Braintree Police Department, and Inspector Stephen Dowd of the U.S. Postal Service in Boston testified at the first hearing. At the second hearing, Dowd again testified, as did the defendant and Julie Carlozzi. Defendant's Motion to Suppress (Docket No. 54) is **DENIED**.

---

    [1] Methylone is a synthetic stimulant that is sometimes referred to colloquially as "bath salts."

**FINDINGS OF FACT**[2]

*1. Background Investigation*

In October 2013, U.S. Postal Service (USPS) investigators opened a package in Hollywood, Florida that contained 500 grams of a "white crystal-like substance" that turned out to be the synthetic stimulant methylone. Dowd Aff. at 4. Investigators determined that a computer with an IP address registered to the Rockland, Massachusetts home of Harold Bates was tracking the parcel's whereabouts, and USPS notifications about the parcel's progress from Hong Kong, where it originated, had been sent to Bates's e-mail account. Moreover, they learned that Bates had tracked as many as five other USPS Express Mail packages sent from Hong Kong and China over the previous two months.

Based on this information, USPS Inspector Stephen Dowd launched an investigation into the receipt and distribution of methylone by Bates. In November 2013, inspectors conducted a "trash pull" at Bates's residence. They found the familiar trappings of drug trafficking — cutoff tops of plastic "baggies," a box for a digital desktop scale,[3] receipts of Western Union

---

[2] These findings of fact are based on the hearings held on February 12 and March 25, 2015, the Stephen Dowd affidavit introduced into evidence as Exhibit 1, and Julie Carlozzi's declaration.

[3] Inspector Dowd observed Bates purchase the scale at the Rockland Post Office on November 14, shortly after Dowd initiated the investigation.

wire transfers to China and Hong Kong, and empty Chinese parcels addressed to Bates.

*2. Dog Sniffs*

A few weeks later, on the morning of December 3, two packages addressed to Julie Carlozzi arrived at the Rockland postal facility. Though they were addressed to Carlozzi, Officer Dowd determined that these packages were ordered by Bates.

Officer Dowd suspected that the parcels addressed to Carlozzi contained drugs, and arranged to have a drug-sniffing canine named "Lucky" inspect them. Dowd took the packages out of the Rockland facility and drove for 20 to 30 minutes to the postal facility in Braintree, where he was greeted by Lucky, a six-year old Labrador retriever, and his handler, Officer Richard Seibert. The Braintree facility is closer to Seibert's home. Dowd conducted the dog sniff there because it is more convenient for Seibert, who has childcare issues. Seibert laid the two packages out on a loading dock, along with four or five "controls" — similarly-sized packages pulled from the mail stream that were not suspected of containing drugs. Lucky "alerted" to the packages, indicating they "contained narcotics or were recently in close proximity to narcotics." Dowd Aff. at 14.

After Lucky alerted, Inspector Dowd drove the packages back to Rockland, donned a letter carrier's uniform, and attempted a controlled delivery to Carlozzi's home. But there was no answer.

Dowd left a package slip and returned the parcels to the Rockland Post Office.

Later that day, Carlozzi called the Rockland Post Office and said she was on her way to pick up the packages. She arrived roughly 20 minutes later. All told, Dowd removed the packages from the mail stream for no more than 2 hours. But <u>delivery</u> of the packages was not delayed, as a letter carrier would not have made the delivery until later that afternoon. After picking up the parcels, Carlozzi drove to a nearby Rite Aid Pharmacy, where police saw her meet Bates and place the packages in the passenger seat of his car. Police followed Bates to his home, and watched him bring the packages inside.

Another two packages from Hong Kong were on track to be delivered a few days later. On the evening of December 5, Dowd spoke to a clerk at the Brockton postal facility and told her he expected packages addressed to Carlozzi to arrive the following morning. Since Dowd knew that Bates was tracking the packages' status online, he asked the clerk not to enter an arrival scan, but to instead reach out to him upon the packages' arrival. Early the next morning, the clerk so notified Dowd, who in turn reached out to Lucky's handler, Seibert, to arrange for a dog-sniff. Dowd removed the packages from the Brockton facility and again took them to the Braintree facility, to accommodate Officer Seibert's childcare issues. There, as before, the packages were set up with

4

controls for Lucky's inspection. As he did on December 3, Lucky alerted to the suspect packages.

At this point, rather than return the packages to Brockton or keep them in Braintree, Dowd took them to his office on Summer Street in Boston. He held them there while he prepared a warrant application, which was granted later that day, December 6. The warrant authorized law enforcement to open the two packages and search Bates's residence. The warrant, however, was not executed that evening. Instead, Inspector Dowd planned a controlled delivery for the following morning.

On Saturday, December 7, Dowd instructed the Rockland postal clerk to enter a fake arrival scan for the two packages. Had the packages not been removed from the mail stream, the actual arrival scan would have been entered roughly 24 hours earlier. As expected, Carlozzi arrived to claim the package shortly after the fictitious arrival scan was entered. As she did four days prior, Carlozzi proceeded from the post office to the Rite Aid Pharmacy, where she was greeted by Bates. After the packages changed hands and Carlozzi drove away, Bates was apprehended by the police. The packages were seized, and field tests later confirmed they contained methylone.

3.  *Carlozzi*

Bates met Carlozzi through mutual friends roughly two months prior to the investigation. He arranged to have the packages sent

to Carlozzi "to avoid arousing suspicion."[4] Carlozzi said she thought the packages contained "weightlifting powder" – bodybuilding supplements from China not yet approved by the FDA. In exchange for picking up the packages, she received gas money, a gift card, or possibly cocaine (though this is disputed). Bates never authorized her to open the package and gave her precise instructions to deliver them to him at the Rite Aid as soon as they arrived. The methylone was not a gift to her and she had no ownership interest in them. She had no further role with respect to the drugs.

## DISCUSSION

*1.  Legitimate Expectation of Privacy*

The government asserts that defendant lacks standing to pursue this motion to suppress because Carlozzi, not he, was the specified recipient of the packages.

A defendant has "standing" to challenge the legality of a seizure on Fourth Amendment grounds if he has a "legitimate expectation of privacy" in the item(s) seized. <u>Rakas v. Illinois</u>, 439 U.S. 128, 148 (1978); <u>United States v. Gomez</u>, 770 F.2d 252, 253, n. 1 (1st Cir. 1985) (noting that this inquiry into whether there is a legitimate expectation of privacy is often referred to as a "standing" issue). A defendant's subjective expectation of

---

[4] March 25 Hrg. Tr. at 32.

privacy must be one that society is ready to accept as objectively reasonable. <u>Minnesota v. Olson</u>, 495 U.S. 91, 95-98 (1990). Fourth Amendment rights generally cannot be vicariously asserted. <u>Alderman v. United States</u>, 394 U.S. 165, 174 (1960).

It is axiomatic that the Fourth Amendment protects "people, not places." <u>Katz v. United States</u>, 389 U.S. 347, 351 (1967) (finding a violation of the Fourth Amendment in attachment of an eavesdropping device to a public telephone booth). Recently, the Supreme Court has emphasized that the <u>Katz</u> reasonable expectation-of-privacy test "add[s] to" but does not "substitute[] for the common-law trespassory test." <u>Jones v. United States</u>, __ U.S. __, 132 S.Ct. 945, 948 (2012) (holding that the government's installation of a GPS device on the vehicle of a target, who was the bailee, and its use of the device to monitor the car's movements, constitutes a search under the Fourth Amendment); <u>Florida v. Jardines</u>, 569 U.S. __, __, 133 S.Ct. 1409, 1417 (2013) (holding that a dog sniff on the porch of defendant's house violated the Fourth Amendment).

Defendant bears the burden of establishing his "legitimate expectation of privacy" in the item searched. <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 105 (1980) (denying a reasonable expectation of privacy in a friend's purse where he had "never sought or received access to her purse prior to that sudden bailment"). The First Circuit has deemed the following factors

pertinent to the threshold inquiry: "ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case." United States v. Aguirre, 839 F.2d 854, 856-57 (1st Cir. 1988). The Court looks to whether the defendant thought of the article that was searched "as a private one, and treated it as such." Id. at 857. The Aguirre factors provide a framework for analyzing standing, but "[n]o single factor determines whether an individual" has a protected Fourth Amendment expectation of privacy. Oliver v. United States, 466 U.S. 170, 177 (1984). Ownership is "neither the beginning nor the end of [the standing] inquiry." United States v. Salvucci, 448 U.S. 83, 91 (1980).

A determination of standing to challenge the mail package here is complicated by the fact that the seized parcels from China were not addressed to Bates, but to Carlozzi, who was serving as a bailee. Not all bailment situations involve giving the bailee such control over an object that the bailor "must be taken to have assumed the risk that [the bailee] would allow someone else to look inside." Wayne R. LaFave,(5th ed. 2012) (quoting Frazier v.Cupp, 394 U.S. 731, 740 (1969)).

8

The government relies on United States v. Givens, 733 F.2d 339, 342 (4th Cir. 1984) (per curiam), where the Fourth Circuit held that a defendant did not have a "tenable" claim of standing to challenge the search of a package sent from "A" and addressed to "B," who in turn gives it to the defendant "C". It reasoned that the addressee, as the owner of the package, could control the use of and access to the container, because defendants "effectively relinquished control" over the mailing envelope and its contents. Id. But, in United States v. Allen, relied on by the defense, the court found standing, emphasizing the property interest defendant had in the postal envelope and its contents, despite the fact that he was not the addressee. 741 F.Supp. 15, 17-18 (D. Me. 1990) (finding standing where the bailee, who was the addressee, was paid to receive the packages but had no ownership interest). See also United States v. Sheldon, 351 F.Supp.2d 1040, 1045 (D. Haw. 2004)(defendant's "ownership interest in the [seized] parcel, along with her control and supervision of the parcel, is sufficient to manifest a subjective expectation of privacy."). But see United States v. Colons-Solis, 508 F.Supp.2d 186, 192 (D.P.R. 2007)(denying standing to a defendant who sent cash to a third-party and "relinquished control over the area in which the contraband [] was searched").

The government argues that, even though Bates was the true owner of the package, it was unreasonable for him to have an

9

expectation of privacy in the parcels at the time of the seizure because they were entrusted to Carlozzi. Bates, they say, "surrendered for a period of time any ability to exclude others from the parcel." Docket No. 67 at 4. However, Carlozzi had no authority to open the packages, and was merely a bailee with no control over access to the package. See United States v. Rodriguez-Ramos, 704 F.2d 17, 21 (1st Cir. 1983) (looking at the conditions of the bailment as relevant to the expectation of privacy). Indeed, the challenged seizures occurred before the packages were delivered to Carlozzi because they were removed from the Rockland (Dec. 3) and Brockton Post Offices (Dec. 6-7), not her home. It was Bates, who owned the packages, who carefully followed their movements in the mail, and gave clear delivery instructions to Carlozzi. In the totality of these circumstances, Bates has met his burden of establishing standing to challenge the seizures.

2.   *Reasonableness*

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. XIV. A sealed package traveling in the mail stream is "unquestionably an effect within the meaning of the Fourth Amendment." United States v. Jacobsen, 466 U.S. 109, 114 (1984). "A seizure of property occurs when there is some meaningful

interference with an individual's possessory interest in that property." Id. at 113. The Supreme Court has held that sealed packages in the mail are "free from inspection by postal authorities, except in a manner provided by the Fourth Amendment." United States v. Leeuwen, 397 U.S. 249, 250 (1970) (involving the detention of a postal package based on reasonable suspicion). Law enforcement officers are barred from opening a sealed package and examining its contents without first obtaining a warrant from a neutral and detached magistrate. Jacobsen, 466 U.S. at 114. However, a parcel may be detained based on reasonable suspicion. United States v. Allen, 990 F.2d 667, 671 (1st Cir. 1993) (finding that a postal inspector did not run afoul of the Fourth Amendment when he temporarily detained a package based on reasonable suspicion). In a parcel detention case, "reasonableness remains the focus of judicial inquiry." United States v. LaFrance, 879 F.2d 1, 6 (1st Cir. 1989) (using a Terry-type analysis for detention of objects). There is no requirement that the government adopt the "least intrusive means imaginable." Id. at 10.

In assessing the reasonableness of the government's actions, the Court must consider: "(1) investigatory diligence, (2) length of detention, and (3) information conveyed to the suspect."

LaFrance, 879 F.2d at 8. Ultimately, the touchstone of the inquiry is reasonableness. As the First Circuit held:

> We must ask whether the detention, taken as a whole, or any step therein, was unreasonable. In doing so we must be careful of the citizen's rights, and equally careful that we do not hold law enforcement to a standard akin to perfection.

Id. at 6. Law enforcement need not notify the package's recipient of the detention, id. at 9, nor does the recipient have a protected interest in the particular route the package takes. See United States v. Demoss, 279 F.3d 632, 639 (8th Cir. 2002) (noting that defendant has no possessory interest in having his parcel "routed on a particular conveyor belt, sorted in a particular area, or stored in any particular sorting bin for a particular amount of time"). The defendant's core interest is in timely delivery.

Bates does not contend that Inspector Dowd lacked a reasonable suspicion to detain the parcels for a canine sniff. Rather, he contends that Dowd acted unreasonably on December 3 by physically removing the package from the Rockland facility and driving it to the Braintree facility, and on December 6-7, by removing the other package from Brockton and bringing it first to Braintree and then to his office in Boston.

As to the first LaFrance factor, inspector diligence, Bates argues that Inspector Dowd should not have agreed to bring the parcels to Braintree, but instead should have insisted that Lucky

and his handler, Officer Seibert, come to Rockland (December 3)
and Brockton (December 6). By moving the packages in the opposite
direction of their intended destination, Bates contends that Dowd
failed to act diligently. Dowd counters that moving the packages
was necessary to accommodate Officer Seibert's childcare issues,
and that failing to do so would have resulted in a greater delay.
He argues, in essence, that moving the packages minimized the
detention. Dowd also notes that, since he is a USPS employee, the
package remained in the Postal Service's exclusive control
throughout the delay. Dowd acted with sufficient diligence.

As to the second factor, length of detention, the delivery
of the December 3 package was not delayed, so its detention — one
to two hours in duration — was not unreasonable. Delivery of the
December 6 parcel was delayed roughly 24 hours. And yet, in
Dowd's view, probable cause attached several hours after the
package was initially delayed — once Lucky alerted — and two
Courts of Appeals have held that the relevant detention to
consider is the period between the initial detention on
reasonable suspicion and the point at which probable cause is
developed, as "[p]robable cause is sufficient to support []
subsequent detention." United States v. Hoang, 486 F.3d 1156,
1160 n.1 (9th Cir. 2006); United States v. Lewis, 902 F.2d 1176,
1180 (5th Cir. 1990) (holding that once a warrant is issued, the
length of subsequent detention is not relevant to the

constitutional analysis). The relevant delay here is at least a few hours and at most one day. It was not unreasonable.

As to the third factor, information conveyed to the defendant, on neither occasion was Bates informed that his package had been detained. On the contrary, information was actively withheld from Bates when Inspector Dowd instructed the Brockton clerk not to enter an arrival scan on December 6. And on December 7, misleading information was conveyed when the clerk entered a fictitious arrival scan. In <u>LaFrance</u>, the First Circuit noted that because the three factors were derived from the luggage context, with its concomitant liberty interest, this third factor is "to be used more circumspectly" in cases involving postal parcels. <u>LaFrance</u>, 879 F.2d at 8 (explaining when your suitcase is detained, you are not free to go about your travels). Properly weighed, the fake arrival scan — which was entered after probable cause had arisen — is insufficient to render the totality of Inspector Dowd's conduct unreasonable.

Defendant asks the Court to apply the reasoning adopted by two state high courts, but these cases are factually distinguishable. <u>See</u> <u>People v. Shapiro</u>, 177 Ill.2d. 519, 524 (1997) (finding unconstitutional a five-day delay in the delivery of a USPS parcel which was diverted from Chicago to St. Louis); <u>State v. Ressler</u>, 701 N.W.2d 915 (N.D. 2005) (involving a transfer of a UPS next-day air service parcel, which was not

14

meaningfully delayed, to a law enforcement agency.) Here, the packages were held within the postal facility (albeit at two nearby locations), and there was no significant delay.

Many courts have upheld similar detentions. United States v. Robinson, 390 F.3d 853, 869-70 (6th Cir. 2004)(detaining a postal package at the Knoxville airport based on reasonable suspicion, and transporting it to the Postal Inspector's office for a canine sniff, did not violate Fourth Amendment); United States v. Evans, 282 F.3d 451, 456 (7th Cir. 2002) (moving a detained package from an Indiana post office to the Indianapolis airport for a dog sniff was reasonable: "we have held that law enforcement authorities are not required to have a canine unit present at every location where a canine inspection is probable or possible."). Here, the packages were only temporarily detained, and were not opened without a warrant. There is no expectation of privacy in not having dog sniffs at mail facilities. See United States v. Place, 462 U.S. 696, 707 (1983). A mail pouch is not a front porch.

Finally, Bates also alleges it was unreasonable to detain the package given Lucky's lack of training and certification for methylone detection, the focus of the investigation. It is true there is no evidence in the record as to whether a dog trained to detect ecstasy and MDMA would also alert to methylone. Still, the postal inspector was not acting unreasonably in briefly detaining

the package to see if the dog alerted to the existence of
narcotics.

3.   *Franks Analysis*

Defendant argues that Inspector Dowd's failure to disclose
Lucky's lack of methylone training to the magistrate judge was
reckless. Moreover, he argues that the Lucky's positive alerts
were not a sound basis for a probable cause determination.
Defendant also contends that Inspector Dowd's use of the words,
"Molly," MDMA, ecstacy, and methylone in his warrant application
demonstrates an intent to mislead the Magistrate Judge into
thinking that these drugs are one and the same. All of these
arguments must fail.

A search warrant can be voided and the fruits of the search
excluded if statements made in the supporting affidavit were
presented to the magistrate in bad faith. "There is [] a
presumption of validity with respect to the affidavit supporting
the search warrant." <u>Franks v. Delaware</u>, 438 U.S. 154, 171
(1978); <u>United States v. Tzannos</u>, 460 F.3d 128, 136 (1st Cir.
2006). Defendant must make "a substantial preliminary showing
that a false statement knowingly and intentionally, or with
reckless disregard for the truth, was included by the affiant in
the warrant affidavit, and [] the allegedly false statement is
necessary to the finding of probable cause." <u>Franks</u>, 438 U.S. at
171. Omissions of material facts are treated the same as

16

affirmative falsehoods. <u>See</u> <u>United States v. Castillo</u>, 287 F.3d 21, 25 (1st Cir. 2005) ("A material omission of information may also trigger a <u>Franks</u> hearing."). An omission, like a falsehood, must be made knowingly or intentionally. <u>Id.</u> (quoting <u>Franks</u>, 438 U.S. at 155-56).

Defendant points out that Lucky was not trained to detect methylone, only MDMA and ecstasy. Although the DEA has described MDMA and ecstasy as "structurally and pharmacologically similar"[5] to methylone, the government concedes that it has no evidence or study that the two drugs are sufficiently similar that a dog trained to detect the odor of one would be able to detect the odor of the other. Instead, the government relies on caselaw that law enforcement may rely on a canine alert to support probable cause even when the dog had not been trained to detect the type of drug ultimately found. <u>See, e.g.</u>, <u>Allen</u>, 990 F.2d at 671 n.1 (deeming the lack of training "irrelevant"); <u>United States v. Robinson</u>, 707 F.2d 811, 815 (4th Cir. 1983); <u>United States v. Outlaw</u>, 319 F.3d 701, 704 (5th Cir. 2003); <u>United States v. Ludwig</u>, 614 F.3d 1243, 1252 n.6 (10th Cir. 2011). However, in these cases, drug-alerting canines were used to sniff for evidence of illegal drugs, not for a specific substance. Here,

---

[5] 78 Fed. Reg. 71 (April 12, 2013) (to be codified as 21 C.F.R. pt. 1308), <u>available at</u> http://www.deadiversion.usdoj.gov/fed_regs/rules/2013/fr0412_2.htm (last visited April 8, 2015)

17

Lucky was sniffing the parcels as part of a methylone investigation.

Defendant argues that it was bad faith or recklessness to rely on a dog-alert for a drug the government knew the dog was not trained to detect. Lucky is certified to detect a broad range of controlled substances, including ecstasy, MDMA, and methamphetamine. Lucky is a graduate of a 12-week training program undertaken in 2011 and received monthly training. Successful completion of a program "can itself provide sufficient reason to trust [the dog's] alert." Florida v. Harris, __ U.S. __, 133 S.Ct. 1050, 1057 (2013). "[I]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." Id. Lucky's initial "imprinting," during which he was trained to alert to specific odors, took place in 2011, before methylone was listed as a controlled substance. In fact, the Drug Enforcement Agency's final rule treating methylone as a Schedule I substance only took effect in April 2013, eight months before the events at issue took place. See 78 Fed. Reg. 71 (April 12, 2013) (to be codified as 21 C.F.R. pt. 1308).

The Court finds no evidence of bad faith or recklessness by law enforcement. There is no indication the handler knew what drug was the focus of the investigation or that Dowd knew one way

18

or another whether the dog would alert to methylone. Neither the omission of Lucky's lack of training on the precise synthetic drug at issue in this investigation, nor the use of the word "Molly" (a slang name for bath salts that even defendant used) come close to rising to bad faith or recklessness.

## **ORDER**

Defendant's Motion to Suppress (Docket No. 54) is **DENIED**.

   /s/ PATTI B. SARIS
Patti B. Saris
Chief Judge